## James Matteson v. Amos Morris.

*Assignee bound by prior equities unless he shows delivery for value—*
*Complainant bound by a responsive answer under oath.*

A mere assignee of securities is bound by any equities that would affect the original holder, if it does not appear that they were delivered to him for value.

Where a foreclosure bill calls for an answer under oath, the existence and consideration of the debt and securities is put in issue, and anything is responsive that explains the transaction. The defendant is called on to answer the whole series of material averments as well as the special interrogatories, and if his answer sets up nothing in avoidance, but only refers to the transactions mentioned in the bill, the complainant is bound by it unless he can overthrow it by counter evidence, and he has the burden of showing the consideration and genuineness of the securities.

The presumption arising from a promissory note, unless in the hands of a *bona fide* holder, is only *prima facie* evidence and cannot overcome credible testimony.

Defendant in foreclosure, being required to answer under oath, denied the receipt of any consideration and the execution of any notes or mortgages as alleged, and charged that if any such papers existed, the signatures were fraudulent. The mortgagee was a grasping money-lender, unlikely to run risks, but the mortgages were for large sums on property of small value, contained no release of dower, and had been assigned without any apparent consideration to a non-resident brother of the mortgagee, in whose name the foreclosure suits were brought. It did not appear that at their date defendant needed any such loans or came into possession of any considerable sums; there was no satisfactory evidence unless the signature was genuine, that he knew of the existence of the mortgages for a long time, or that he ever acquiesced in them, but it appeared that when he claimed to have discovered their existence he assailed them by prompt legal proceedings. Testimony as to the genuineness of the signature was conflicting, and no witness to the actual signing was produced. The Supreme Court found that the papers were fabricated and ordered the bills of foreclosure to be dismissed, with costs of both courts.

All reasonable presumptions should be indulged in favor of innocence.

Error to Cass. Submitted November 22, 1878. Decided January 8, 1879.

FORECLOSURE. Defendant appeals. The facts are in the opinion.

*Severens, Boudeman & Turner* for complainant and appellee. One who takes notes before they are due is presumed to be a *bona fide* holder for value without notice of any equities, *Wrightman v. Hart*, 37 Ill., 123; *Johnston v. Dickson*, 1 Blackf., 256; *Grimes v. McAninch*, 9 Ind., 278; *Hawks v. Hinchcliff*, 17 Barb., 492; *James v. Chalmers*, 2 Seld., 209; *Wilson v. Lozier*, 11 Gratt., 483; *Ross v. Bedell*, 5 Duer, 462; *Cumings v. Thompson*, 18 Minn., 252; *Kelly v. Ford*, 4 Ia., 140; *Harvey v. Towers*, 4 Eng. L. & E., 531; 1 Daniel's Neg. Inst., § 814, p. 610. The fact that an assignment is under seal imports that the holder is a *bona fide* holder for value, *Hancock's Appeal*, 34 Penn. St., 155.

*Geo. W. Lawton, E. Bacon* and *O. W. Coolidge* for defendant and appellant. In a foreclosure bill the inducement should be pleaded, and a consideration averred aside from the recitals in the instruments themselves, 3 Daniell's Ch. Pr., 1908; *Dye v. Mann*, 10 Mich., 291. As to burden of proof, see *Comstock v. Smith*, 26 Mich., 310; *Willett v. Shepard*, 34 Mich., 106; effect of sworn answer, *Schwarz v. Wendell*, Walk. Ch., 267; *Robinson v. Cromlein*, 15 Mich., 316: *Roberts v. Miles*, 12 Mich., 297; sufficiency of denials of execution, *Burson v. Huntington*, 21 Mich., 415; *McCormick v. Bay City*, 23 Mich., 457; *Gibbs v. Linabury*, 22 Mich., 479; *Anderson v. Walter*, 34 Mich., 113; *Smith v. Sac Co.*, 11 Wall., 147; no admission by implication, *Morris v. Morris*, 5 Mich., 171; *Hardwick v. Bassett*, 25 Mich., 149; as to what is responsive, *Shook v. Proctor*, 27 Mich., 349; *Mandeville v. Comstock*, 9 Mich., 536.

CAMPBELL, C. J. These proceedings are for the purpose of foreclosing two mortgages and accompanying notes, one dated February 14, 1873, for $3,469, payable at the expiration of five years, with interest annually at ten per

cent., and the other dated February 28, 1873, for $1,770, payable in one year, with interest at ten per cent.

These securities purport to be payable to Milo D. Matteson, or order, and are claimed by complainant to have been assigned to him on the 21st of July, 1873.

The bill in each case sets up that Morris claims the notes and mortgages to be forgeries, and that he also claims that he never had any but certain specified dealings with Milo D. Matteson; which claims are controverted by complainant, who avers dealings to the amount of $15,000 borrowed and received by Morris, and notes to the number of upwards of forty, from small sums up to more than five thousand dollars each.

The bill does not in either case make any averment concerning the consideration of either of the securities in suit, but avers the amounts due and unpaid, and asks a decree for the full amount.

An answer under oath was required, and Morris answered, relying upon certain defects in the averments of the bill; denying positively any consideration received, denying the execution and delivery of any such notes and mortgages or any contract to make or deliver them, and averring his ignorance of their existence except as derived from the assertions of Milo D. Matteson. The answer asserts that if any such papers are in existence they were obtained by some fraud in procuring the signatures, and that defendant has no knowledge of making or acknowledging them. He also denies on information and belief that complainant is a *bona fide* holder.

These mortgages, together with a third one of $5,018, dated June 21st, 1873, were recorded in Cass county, where the lands lie, on June 28, 1873. Morris lived in Van Buren county, as did also Milo D. Matteson. Complainant lives in the State of New York. The assignments were never recorded.

One of these bills was filed in April 1875, and the other in September, 1875. On the 4th of August, 1873, a bill had been filed by Morris against Milo D. Matteson

to set aside the mortgages and restrain their transfer. The oath of that defendant was waived, but he answered without oath, setting up the assignment to complainant and denying the statements of the bill, but not explaining the consideration of the notes beyond averring the advance of $410 on the earliest, and $240 on the second. He admits no money was advanced on the third. That suit does not appear to have been brought to a conclusion, and the substantial merits are all involved in the present controversy.

A preliminary question was raised whether complainant stands in the same position as Milo D. Matteson upon the defense of want of consideration—if the paper is genuine,—or whether as a *bona fide* holder without notice he can recover, although no consideration should have passed.

Complainant is not an endorsee of either of these notes. He took them under assignment merely, one of them purporting to be guaranteed and the other not. He is not therefore under our statute (Comp. L., § 5775) in a position to sue upon them at law in his own name. Moreover, there is no evidence of delivery beyond such presumption as may arise from the possession of the assignments, which were never recorded, and there is no evidence whatever that he paid anything for the securities. The only testimony showing any possession of the documents relates to their being received from him by mail several days after Morris filed his bill. As there was time in the interval to send forward the papers and have them returned, this testimony is not very important. The testimony concerning the papers was such as in our opinion to call for explanation, and we cannot assume from any thing we find in the record that James Matteson, with or without notice, ever gave value for these papers. He is therefore bound by any equities which would affect his brother Milo.

The whole case is open, then, to inquire whether these papers were either forged or fraudulent, or whether, on the other hand, they are valid and binding.

Before proceeding to discuss the merits, the case is one raising some questions concerning the burden of proof.

It is not explained satisfactorily why we have not been furnished with the testimony of the parties best acquainted with the facts. James Matteson and Milo D. Matteson are the only persons, so far as we can gather from the record, who could tell under what circumstances and for what purposes the alleged assignments were made. Milo D. Matteson and Morris both must know whether any transaction existed which could give legal efficacy to the securities, and whether such papers were actually and intentionally executed. The notaries, who were subscribing witnesses, did not see the signatures affixed, and knew nothing of the business beyond the recognition and acknowledgment. One subscribing witness, the father of complainant, was not sworn. James and Milo were not sworn. Morris put in a discovery under oath, and was not sworn further. It becomes, therefore, important to know which party had the burden thrown upon him.

The bill calling for an answer under oath put necessarily in issue the existence and consideration of both notes and mortgage. Anything was responsive to the bill which bore upon the transaction or explained its circumstances. Under the well settled rules of pleading Morris was called upon to answer not merely the special interrogatories, but the whole series of material averments, and his answer setting up no matters in avoidance, but referring only to the transactions mentioned in the bill, must stand until overthrown by sufficient counter evidence. *Schwarz v. Wendell*, Walk. Ch., 267; *Robinson v. Cromelein*, 15 Mich., 316.

The latter case is directly in point, and holds that under such an answer as was filed to each of these bills, the complainant is bound to show consideration or be bound by the denial.

It cannot be reasonably urged that the ordinary presumption arising from a promissory note can overcome the oath of a witness called by the complainant himself

who denies it. Such a presumption except in favor of a *bona fide* holder is one which can always be overcome by proof, and is at best but *prima facie* evidence. It cannot overcome credible testimony. And the same rule of pleading before referred to called on complainant to show affirmatively the genuineness of the documents, concerning which defendant had been specially interrogated, and which he denied.

The defense of forgery rests on two alternative theories: *first,* that the signatures themselves are not genuine; and *second,* that if genuine they were procured by some trick to be appended to false documents. And in this controversy the question of consideration becomes very important. If no consideration passed, the probability of actual forgery of some kind is increased.

No one swears that he saw Morris sign these papers. The subscribing witnesses and notaries, Foster and Coleman, who were sworn, testify to a recognition of the documents. The subscribing witness A. M. Matteson, whose name appears on the second mortgage, was not sworn.

The testimony of witnesses as to resemblance and genuineness of handwriting is conflicting, and not any more satisfactory than such testimony is apt to be in such cases. The impressions of the immediate friends of Morris are strongly against the genuineness of the disputed signatures. Usually such impressions are more reliable than the reasons given for them, and in ordinary cases they are valuable. Most of the witnesses for complainant are merely sworn as experts, from comparisons made for the occasion. This puts them in no better position to judge than any other observer who has no personal acquaintance with the handwriting of the parties, and who has the usual means of judgment. Unfortunately there are some of the compared papers which are open to the same dispute as to genuineness as those in issue, and witnesses who have not been

40 MICH.—8.

called to the stand until it has been ascertained they will give favorable testimony cannot always distinguish the impressions they have received from particular papers. The home witnesses on both sides have evidently been more or less prejudiced by the local disturbance of this litigation, and after considering the whole of this extended testimony upon handwriting, we do not find ourselves much aided by it. The impression made on us by our own comparison of the papers is unfavorable to the genuineness of the signatures. But our previous experience has convinced us that it is not always possible to decide such matters on signatures alone, and that it is not wise to do so unless where the case is bare of circumstances which may throw light on the probabilities. The worst forgery this court was ever required to pass upon was one where the fact was proved beyond any doubt, and yet the signatures were so perfect that their genuineness,—without conclusive proof of other facts,—could not have been overthrown.

Apart from and independent of any question on the appearance of the signatures, the facts to counterbalance the denials in the answer of Morris do not in general tend in that direction. They rather tend the other way.

While it is quite possible for persons to borrow money and use it for purposes not known to their friends, it cannot be denied that when any such controversy arises as we have before us, some light is thrown on the probabilities by the pecuniary condition of the parties. In the present case loans are involved to the amount of about ten thousand dollars within a period of four months and a few days. Of this over five thousand dollars was claimed to have been secured in the same month and at intervals of two weeks. During all this time Morris, so far as any one can see, was in no need of such loans, and was not known by any one to have had any considerable sums in possession, while he incurred some small debts during this period which would naturally have been paid or not incurred if he

had cash means. If he had any such moneys it is difficult to believe that some one could not have traced them.

Milo D. Matteson appears beyond doubt to be a grasping and sharp money lender; and there is nothing to warrant the belief that he would lend money on doubtful securities, or run any risks with those he took. It is not usual for such dealers to lend so much money on lands of the moderate value here shown. An unencumbered title to the lands would not warrant such loans. In the present case there is the very unusual absence of a release of dower from each one of the mortgages, which would greatly reduce their value. A wife may very wisely and properly decline joining in mortgages which she does not approve. But where a mortgage is for any large amount it is rarely taken without at least seeking her concurrence. In the present case she was ignorant of their existence. To meet this suspicious fact, a theory is advanced that Morris desired to conceal the loans and securities from the knowledge of other persons. No one testifies to any such desire on his part. There is testimony that Mattison gave this story as a reason why he did not record his mortgages. He does not offer himself as a witness to show any such expression from Morris, and it is improbable that a mortgagee would run such risks, or be willing to hazard the priority of his securities to aid in a concealment which could only be desired for purposes which were questionable.

It is also significant that as soon as the dispute arose Milo D. Matteson made haste to put the papers out of his hands, and to create a pretense that they had been transferred to a *bona fide* holder. There is not the least evidence or probability that these alleged transfers were honest sales of the mortgages. And if the mortgages themselves were genuine and honest securities, there was no good reason why the mortgagee should not have retained them.

There is no evidence which in our opinion indicates

any conduct on the part of Morris showing a knowledge of or acquiescence in the mortgages. There is positive proof that he was notified about the first of August, 1873, of the record of the mortgages, and that he at once took energetic measures to assail them; and that this was met by a claim of a previous assignment to a non-resident brother of the mortgagee, under instruments not recorded.

If this was a course of actual dealings, Milo D. Matteson knew all about it. He knew whether he lent money to Morris or not, and precisely what passed between them. He knew every circumstance which would determine the genuineness or falsity of the papers, and the consideration if there was one. He knew whether Morris signed these papers, and whether he did so understanding what they were or supposing them to be different. He knew also, and complainant also knew why and how the assignments originated. Morris had been sworn to an answer and positively denied the genuineness of the documents as well as their consideration. The notaries knew nothing of either except as they claim to have got their knowledge after the papers were signed. A failure to testify under all these circumstances cannot be accounted for on any honest hypothesis. It confirms all the testimony opposed to the genuine character of the transactions set up.

In the only document in which Milo D. Matteson attempts to explain the transaction, which is his unsworn answer to the bill filed by Morris, he does not pretend to aver any loan on the largest of the three mortgages, nor more than about fourteen per cent. on the other two, and gives no explanation as to the origin of the remainder. Such a showing is inconsistent with any honest transaction, and is not reasonably credible as to any dealings.

The only hypothesis consistent with the genuineness of these papers is that there were some secret dealings between the parties which Morris was interested in con-

cealing. There is no proof of this, and no reason why Matteson should fail to explain them.

Under these circumstances we do not think it necessary to enter upon any speculations as to the manner in which these papers were made to appear genuine, whether the signatures are actually fictitious, or real signatures procured by some peculiar fraud. We have no doubt that they are fabricated papers. We are not required to determine the guilt of any one but the mortgagee, and we do not think the testimony requires any further remarks on that subject. We do not feel that we know enough about the method of procedure to pass upon the guilt or innocence of any one else, and all presumptions that can reasonably be indulged should be in favor of innocence where it is possible.

The decrees below should be reversed, and the bills dismissed with costs of both courts.

The other Justices concurred.